## Commonwealth v. Great Lakes Television Co.

*John C. Kelley, Hull, Leiby & Metzger* and *John W. English,* for appellant.

*Walter E. Alessandroni,* Attorney General, and *Morley W. Baker,* Asst. Attorney General, for Commonwealth.

LIPSITT, J., March 30, 1966.—The Bureau of Employment Security, Department of Labor and Industry, Commonwealth of Pennsylvania (hereinafter called "Department") made an assessment against Great Lakes Television Company, which is engaged in the business of television broadcasting, for failure to include in its periodic reports, as required by the Pennsylvania Unemployment Compensation Law, Act of December 5, 1936, P. L. (1937) 2897, as amended, et seq., 43 PS §751, et seq., "wages" paid to individuals as "talent fees" for four quarters of 1962 and two quarters of 1963.

A petition for reassessment was filed by Great Lakes Television Company (hereinafter called "petitioner") wherein it was denied that claimant, Mary Mainzer Greco, was an "employee", and that payment for her services was subject to the Unemployment Compensation Law. A hearing was held on July 15, 1964. An order dated April 14, 1965, by the department, determined that petitioner was an "employer" of Mary Mainzer Greco and others, that the talent artists involved were "in employment", and that the remuneration received was "wages" within the meaning of the said Pennsylvania Unemployment Compensation Law.

This proceeding is an appeal from the decision of the department. The reassessment petition and the specific facts in the testimony at the hearing relate only to Mary Mainzer Greco (hereinafter called "claimant"). Included in the assessment were seven other persons whose relation to petitioner was similar to claimant's. These persons and the nature of their

services were referred to generally in the testimony, and the order of the department held petitioner liable for contributions for Mary Mainzer Greco and these others.

The only issue involved is whether individuals known as talent artists performed services "in employment" for "wages" for petitioner within the intent and meaning of the said law.

Mrs. Greco, according to the testimony at the reassessment hearing, entered into a relationship with petitioner when she won a contest to perform as a weather girl for a sponsored program. She subsequently did various commercials both for the company sponsoring the weather program and for another company. Except for a written agreement to participate in the contest and receive a minimum weekly salary, if selected, there was no formal contract signed, but there was an agreement reached for an amount of pay, the time involved and the type of job to be performed. The rate of her compensation could not be less than that called for by the union contract, but could be higher, depending upon the ability of claimant. The payments were made without deductions of any sort and were made by checks drawn on the general account of petitioner, rather than on the payroll account. The union contract excluded talent artists from the definition of employes.

The work performed by claimant was at petitioner's studio, at a time set by petitioner and its clients, and the equipment of the station was used. The props for the program were furnished by the station as well as the make-up facilities. The direction to claimant, as well as others classified as talent artists, was given by petitioner. In the Greco case, the program had no script, but for the others the program script was furnished by the television company or sponsor.

Mrs. Greco testified that she had no previous tele-

vision experience before working for this station and had no other employment in the television industry during the time involved. She said that she received about 10 hours of training or instruction prior to her appearance as the weather girl. During the year 1962, she had other employment. She married the weather man in October of 1962, and after her marriage, restricted her employment to petitioner's station. She was replaced on the weather program after May 31, 1963, but continued to do commercials for another sponsor until July of that year.

The pertinent statutory provisions of the said Unemployment Compensation Law are:

1. Section 4(1) (1), 43 PS §753, which provides that " 'Employment' means all personal service performed for remuneration by an individual under any contract of hire, express or implied, written or oral, including service in interstate commerce, and service as an officer of a corporation".

2. Section 4(1) (2) (B), which provides in part that "Services performed by an individual for wages shall be deemed to be employment subject to this act, unless and until it is shown to the satisfaction of the department that—(a) such individual has been and will continue to be free from control or direction over the performance of such services both under his contract of service and in fact; and (b) as to such services such individual is customarily engaged in an independently established trade, occupation, profession or business".

As in many other cases of this kind, to meet the exclusionary requisites of the statute, there must be a factual determination of the extent and character of control and whether the activities are ordinarily engaged in by a person considered independent, or whether the services are ordinarily done within the framework of an employer-employe relationship. See Bureau of Employment Security v. AAA Moving and

Storage Company, 24 D. & C. 2d 494, 76 Dauph. 335 (1961); Department of Labor and Industry v. Research, Inc., 68 Dauph. 267 (1955); Vaughan v. Warner, 157 F. 2d 26 (1946); Schmidt v. Ewing, 108 F. Supp. 505 (1952). To decide if individuals characterized as talent artists, or, in some parts of the testimony, as free-lancers, are ordinarily engaged in or considered to be an independent occupation or business would be extremely difficult, as there is no established meaning for this occupational designation. The basic question here is whether control of the services existed in the artist or the television company as an ultimate fact. No Pennsylvania cases have been found which are directly in point, so the decision must be made on certain general principles.

The usual terminology is to describe a person under control of another as an employe and one free of control as an independent contractor. The Pennsylvania Superior Court has stated that the test in determining whether a workman is an employe of a person who engaged him is whether he is subject to the latter's control or right of control, not only with regard to the work to be done, but also with regard to the manner of performing it, and it is not the fact of actual interference or exercise of control by the employer, but the existence of the right or authority to interfere or control which renders one an employe rather than an independent contractor: Eggelton v. Leete, 186 Pa. Superior Ct. 542 (1958).

The Commonwealth here argues that petitioner had the authority and right to control the manner in which the artist performed her job. Petitioner asserts that claimant was free of control and direction over the performance of her services. It contends that several factors show as a matter of fact that claimant was an independent contractor. It points out there were no demands on the time of claimant, except that she be

prepared to do her show or commercial at the proper time; that her method of presentation was to be developed as she saw fit; that she was free to do similar services on other television stations and that she was responsible for obtaining and organizing the material which she presented on the weather girl show. The difficulty in deciding a case of this type is that there is a continuum of gradations in business relationships between an individual who is strictly an employe and another who is an independent contractor, and the problem is to determine where the line of demarcation lies. No single factor is conclusive.

According to the testimony at the hearing, persons performing services for a television company may be broken down into three categories. There are regular employes who are employed for 40 hours per week and entitled to fringe benefits, such as paid vacations, time and a half for overtime, etc. There are part time employes who may work up to 20 hours a week, and they are also entitled to paid vacations, overtime and accumulate seniority, etc. "The third category, free lancer —these people are contracted by the station. The station is acting in the capacity of a producer. It employs people to come in to do one specific job for which they are paid. They punch no time clock. They are not required to stay a certain amount of hours. It might take them from 10 to 40 minutes to prepare for their spot. It is up to them".

An examination of the mode and means of performance is of importance and significance, where the television station, here petitioner, is acting in the capacity as a producer. In this situation, the persons who are designated as talent artists are hired by the television company with the consent of the sponsor, sometimes without the sponsor's consent, and even though there are no regular work hours, the artist is required to appear and perform at the time set by the company

and/or sponsor. The artist has no control of the particular time. The company and/or the sponsor prepares the script if a script is used in a particular program, and while there is a certain area for the development of presentation by the artist, the acceptance of the performance is discretionary on the part of the company and/or the sponsor. The television company provides the props used by the artist and the make-up facilities. This is not a situation where an independent producer or the artist herself (or himself) purchases time from the television company and then subsequently obtains a sponsor who pays for the artist's talents and time. The manner of performance under the conditions existing here compels the conclusion that these artists are not, in fact, free from the control of petitioner.

Petitioner stresses as points for its position that claimant's compensation was based on fees earned and was paid from the general business account, rather than the payroll account, that there were no deductions being taken from her compensation, and that she received no fringe benefits of any kind. In the case of Rodgers v. P. G. Publishing Co., 24 D. & C. 2d 81 (1960), affirmed 194 Pa. Superior Ct. 207 (1960), the court held that neither the methods of payment nor the fact that no provisions were made for withholding of social security or income taxes is determinative of the question of whether claimant was an employe or an independent contractor. The method of payment is, of course, a feature to be considered, but, as stated previously, no one element is controlling.

In accordance with the reasons expressed, we make the following

### CONCLUSIONS OF LAW

1. During the period March, 1962, until July, 1963, Mary Mainzer Greco was an employe of Great Lakes

Television Company within the meaning of the Pennsylvania Unemployment Compensation Law of December 5, 1936, P. L. (1937) 2897 et seq., as amended, 43 PS §751, et seq.

2. Remunerations received by Mary Mainzer Greco were wages within the meaning of said law.

3. Great Lakes Television Company was liable for contributions based on wages received by Mary Mainzer Greco from the Great Lakes Television Company during her period of employment.

4. The manner and means of performance of services by individuals designated as talent artists by Great Lakes Television Company do not bring said artists within the excluding provisions of the said Unemployment Compensation Law.

We enter the following

ORDER

And now, March 30, 1966, the appeal of Great Lakes Television Company is denied, and the assessment made by the Bureau of Employment Security, Department of Labor and Industry of the Commonwealth of Pennsylvania, is affirmed.